UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT JOHN STOCKTON,

Plaintiff,

v.

SMITH, et al.,

Defendants.

Case No. 24-cv-06676-HSG

**ORDER DENYING PLAINTIFF LEAVE TO FILE SURREPLY; GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 32, 37

Plaintiff, an inmate at California State Prison – Corcoran, filed this *pro se* action pursuant to 42 U.S.C. § 1983 against former Pelican Bay State Prison ("PBSP") warden Smith, and PBSP correctional officers Juneau and Durham, alleging that they were deliberately indifferent to his safety in violation of the Eighth Amendment when they placed inmate Winson in his housing unit group in May 2024. Now pending before the Court is Defendants' motion for summary judgment. Dkt. No. 32. Plaintiff has filed an opposition, Dkt. No. 33; Defendants have filed a reply, Dkt. No. 36; and Plaintiff has filed a request for leave to file a surreply, Dkt. No. 37. For the reasons set forth below, the Court DENIES Plaintiff's request for leave to file a surreply, Dkt. No. 37; and GRANTS Defendants' summary judgment motion, Dkt. No. 32.

## FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted.

During the relevant time period, Plaintiff was housed at PBSP, defendant Smith was PBSP warden, and defendants Juneau and Durham were PBSP correctional counselors. Dkt. No. 32-5 ("Smith Decl.") at ¶ 1; Dkt. No. 32-4 ("Juneau Decl.") at ¶ 1; Dkt. No. 32-3 ("Durham Decl.") at ¶ 1.

//

**I. Restricted Custody General Population ("RCGP") Placement**

In May 2024, inmates who faced a substantial threat to their personal safety if housed in the general population could temporarily be placed in a housing unit called Restricted Custody General Population ("RCGP"). RCGP is an increased security setting with additional restrictions on inmate movement. Juneau Decl., ¶ 2; Smith Decl., ¶ 4. The purpose of RCGP was to house inmates with safety concerns until the inmate demonstrated that he could be safely reintegrated into the inmate population in a regular housing unit. Smith Decl., ¶ 7. To demonstrate that they could safely program with other inmates, RCGP inmates could seek placement in a group and spend out-of-cell time with the inmates assigned to the group. Smith Decl., ¶ 7. Spending out-of-cell time with a small group of inmates without any serious incidents occurring demonstrated that the inmate could be safely placed in a larger inmate population. Smith Decl., ¶ 7; Juneau Decl., ¶ 7; Dkt. No. 32-2 at 15.

Upon an inmate's assignment to an RCGP, the prison's Institutional Classification Committee ("ICC") reviewed the inmate's case factors to determine the inmate's local programming, including access to an outdoor exercise yard or dayroom. Smith Decl., ¶ 5. For their out-of-cell time (exercise yard and dayroom), an RCGP inmate was assigned either to "walk alone" status or to a group. Smith Decl., ¶ 5. An RCGP inmate on "walk-alone" status attended yard alone with no physical interaction with other inmates. Smith Decl., ¶ 5. An RCGP inmate assigned to group attended yard with inmates assigned to their specific group. Smith Decl., ¶ 5. If the ICC determined that an RCGP inmate was eligible for group, the ICC considered the following factors in determining which group would be appropriate: the other inmates assigned to the particular group, the inmate's list of documented enemies, the inmate's documented Security Threat Group affiliations (if any), and the inmate's recent rules violations. Durham Decl., ¶ 3; Juneau Decl., ¶ 3; Smith Decl., ¶ 6. The ICC also conducted a hearing with the inmate present, interviewed the inmate for any safety concerns, and verified whether the inmate felt they could safely participate in the specific group under consideration. Durham Decl., ¶ 3; Juneau Decl., ¶ 3; Smith Decl., ¶ 6. Because the RCGP was a high security setting, it was not uncommon for RCGP inmates to have disciplinary histories including violence-related infractions. Juneau Decl., ¶ 8;

Smith Decl., ¶ 8. Therefore, unless an RCGP inmate's case factors indicated a significant risk of violence towards the other inmates assigned to a specific group, the fact that an RCGP inmate had a disciplinary history including violence-related infractions did not necessarily preclude the RCGP inmate from participation in group. Smith Decl., ¶ 8.

**II. Inmate Winson**

In 1989, inmate Winson entered into CDCR custody pursuant to a conviction for first degree murder and attempted first degree murder and related term of life without parole. Dkt. No. 33 at 51. In 1994, inmate Winson was validated as part of the Aryan Brotherhood Security Threat Group ("STG"). Dkt. No. 33 at 52. Inmate Winson is white. Dkt. No. 33 at 52.

In or around January 2017, after reviewing inmate Winson's file and numerous documents, the CDCR Departmental Review Board ("DRB") concluded that inmate Winson's safety was at risk in general population. The DRB noted the following. Since approximately 1995, inmate Winson had been targeted by the Aryan Brotherhood for assault for a variety of reasons, including refusing to carry out ordered assaults, claiming Aryan Brotherhood membership, and utilizing Aryan Brotherhood member's names without their permission. On August 20, 2015, while housed at Kern Valley State Prison, a validated Nazi Low Rider STG associate attempted to murder inmate Winson. Dkt. No. 33 at 52.

On February 28, 2017, inmate Winson arrived at the RCGP and was cleared to program in Group 1. Dkt. No. 33 at 52.

On September 12, 2017, inmate Winson battered inmate Cole with a deadly weapon. Dkt. No. 33 at 52. As a result, inmate Winson was placed on Walk Alone ("W/A") status. Dkt. No. 33 at 52.

On December 16, 2018, the ICC cleared inmate Winson to program with other inmates in Group 2. Dkt. No. 33 at 52.

On March 6, 2019, the ICC approved inmate Winson for double-cell status and declined inmate Winson's request to be celled with a specific Aryan Brotherhood affiliate. Dkt. No. 33 at 52.

On October 9, 2020, after determining that inmate Winson remained at risk from the Aryan

Brotherhood, the DRB continued inmate Winson's RCGP placement. Dkt. No. 33 at 52.

On July 13, 2021, a validated Aryan Brotherhood associate battered inmate Winson. Dkt. No. 33 at 52.

On January 13, 2022, the DRB concluded that inmate Winson remained a priority target for the Aryan Brotherhood and that RCGP placement therefore continued to be appropriate. Inmate Winson denied having issues with the Aryan Brotherhood, stating that all his prior altercations were unrelated to the Aryan Brotherhood and due to personal issues with the other inmate involved. Dkt. No. 33 at 52.

On April 29, 2022, an STG Investigator reviewed inmate Winson's file. At that time inmate Winson was assigned to Group 2. The STG investigator reported the following. Inmate Winson attended yard, dayroom, and group activities without incident. While inmate Winson was not disruptive, he did not get along well with staff and other inmates in his housing unit. Due to inmate Winson having been accused of disrespecting an Aryan Brotherhood member, the Aryan Brotherhood had deemed inmate Winson a priority target, with the order supported by two additional Aryan Brotherhood members. Two Aryan Brotherhood members had implemented an authorization to assault/murder any RCGP white inmate who did not, within thirty days of being placed in group, assault another inmate with the intent of murdering that inmate. Despite the Aryan Brotherhood directive to members to assault inmate Winson, inmate Winson had successfully programmed in RCGP group settings for a number of years. However, there was no information indicating that the Aryan Brotherhood had ceased targeting inmate Winson. Based on this information, prison officials decided to retain inmate Winson in RCGP with continued Group 2 clearance. Dkt. No. 33 at 52.

On November 2, 2022, an 180-Day Safety Review was conducted for inmate Winson. Prison officials again concluded that inmate Winson's safety would be at risk in general population and retained him in RCGP. Staff reported that inmate Winson was a porter; was assigned to Group 2; attended yard, dayroom, and group activities; and while not disruptive, did not get along well with staff and other inmates. Dkt. No. 33 at 52.

On February 17, 2023, inmate Winson attempted to murder inmate Perkins and

consequently was rehoused in the Administrative Segregation Unit ("ASU"). Dkt. No. 33 at 52.

On November 15, 2023, the ICC recommended that inmate Winson be released from the ASU, and placed back into RCGP Facility B on close custody status with walk/alone status, double cell clearance, and individual exercise yard. Dkt. No. 33 at 53, 57-58.

From November 2023 to May 2024, inmate Winson served as a porter on Plaintiff's tier. Plaintiff and inmate Winson talked daily through Plaintiff's door and their interactions were cordial. Dkt. No. 32-2 at 19-20. However, Plaintiff did not know if inmate Winson was "playing" him and being friendly "just for the benefit to get next to you." Dkt. No. 32-2 at 20. Plaintiff got along "fairly well" with inmate Winson but described themselves as having different politics, explaining that he was motivated to obtain parole whereas "some of these guys that maxed out parole [like inmate Winson], they don't care about that." Dkt. No. 32-2 at 20.

**A. Inmate Winson's Assignment to Group 6**

On May 23, 2024, Defendants chaired inmate Winson's ICC. Durham Decl., ¶ 7; Juneau Decl., ¶ 7; Smith Decl. ¶ 3; Dkt. No. 33 at 56-58. To determine inmate Winson's RCGP group assignment, Defendants reviewed the following case factors: classification reviews while in CDCR custody; documented enemies; Security Threat Group affiliations; and disciplinary history, including the February 2023 incident of violence. Based on this review, Defendants concluded that there was no indication that inmate Winson would act violently towards Plaintiff or any Group 6 inmate, or that inmate Winson would target and attack any white inmate in his group. Durham Decl., ¶¶ 8, 9; Juneau Decl., ¶¶ 8, 9; Smith Decl., ¶¶ 11, 12.

At this meeting, inmate Winson requested to be assigned to a group. Inmate Winson told Defendants that he believed he could safely program with the inmates assigned to Group 6, which included Plaintiff. Durham Decl., ¶¶ 7, 9; Juneau Decl., ¶¶ 7, 9. At that time, Inmate Winson's records indicated no documented enemy concerns with any inmates in Group 6 and no documented enemy concerns with Plaintiff; indicated that inmate Winson and Plaintiff were not documented affiliates of enemy STGs; and indicated that inmate Winson and Plaintiff were affiliated with the same STG. Dkt. No. 33 at 56-58; Durham Decl., ¶ 8; Juneau Decl., ¶ 8; Smith Decl., ¶ 12. Defendants removed inmate Winson from Walk-Alone status and Individual Exercise

Yard status, and cleared inmate Winson for participation in Group 6. Dkt. No. 33 at 56-58.

Plaintiff was not informed beforehand about inmate Winson being assigned to his group and was not asked whether inmate Winson posed a threat to his safety. Dkt. No. 22 at 20. Previously, when inmate Blakeslee, a white inmate, had been assigned to Plaintiff's group, correctional officials informed Plaintiff beforehand and obtained assurances from both Plaintiff and inmate Blakeslee that they could program together peacefully before approving inmate Blakeslee's placement into Plaintiff's group. Dkt. No. 22 at 20; Dkt. No. 33 at 64. Plaintiff and inmate Blakeslee programmed together peacefully for four months until inmate Blakeslee was transferred to another prison. Dkt. No. 22 at 20.

**B. Inmate Winson's Arrival in Group 6 and May 31, 2024 Incident**

In December 2023, Plaintiff was cleared for participation in Group 6. Durham Decl., ¶ 6. Plaintiff remained in Group 6 until May 31, 2024. Durham Decl., ¶ 6. Prior to inmate Winson's arrival, Plaintiff was the only white inmate in this group and the remaining inmates were Hispanic. Dkt. No. 32-2 at 15.

On or around May 23, 2024, inmate Winson was placed in Group 6 and assigned to the cell next to Plaintiff. Dkt. No. 32-2 at 19-20. Despite their prior cordial relationship, Plaintiff was suspicious of inmate Winson due to inmate Winson's attempted murder of inmate Perkins. Plaintiff noticed that staff was hyper-vigilant once inmate Winson arrived in Group 6. Usually the atmosphere in dayroom was relaxed and the guards did not have riot guns. However, after inmate Winson's arrival, whenever inmate Winson and Plaintiff were at day room, staff would stand at the windows with riot guns, as if they were waiting for something to happen, and would keep their eyes on inmate Winson and Plaintiff. Plaintiff talked to inmate Winson, trying to encourage inmate Winson to program together peacefully. During that first week, inmate Winson followed Plaintiff everywhere and Plaintiff could not shake him. But there were otherwise no notable interactions with inmate Winson that first week. Dkt. No. 32-2 at 22.

Plaintiff did not inform Defendants or any other correctional officer about his concerns. Plaintiff stated at his deposition that if an inmate felt he was in immediate danger, he could tell staff to ask that they be separated immediately. Dkt. No. 32-2 at 16-17. But he also qualified that

if an inmate prematurely informed staff that he had safety concerns or went to staff every time he felt intimidated or threatened, it would make an inmate "look like [he had] . . . mental issues" or "look silly." Dkt. No. 32-2 at 16-17.

On May 31, 2024, when Plaintiff arrived at yard, he saw inmate Winson speaking with one of the Southern Hispanic inmates. Plaintiff walked over, shook inmate Winson's hand, and walked away. Inmate Winson followed Plaintiff. After one or two laps around the yard, Plaintiff felt inmate Winson grab his arm and then saw inmate Winson pull out a knife. Plaintiff and inmate Winson struggled. Plaintiff wrestled the knife away from inmate Winson and stabbed him, and kept yelling, "Get on the ground," and did not stop until he saw that correctional officers were close enough for Plaintiff to feel safe. Dkt. No. 32-2 at 24-30.

On June 9, 2024, Plaintiff was issued RVR No. 7450428 by correctional officers, accusing him of attempting to murder inmate Winson. Dkt. No. 22 at 32. On January 30, 2025, inmate Winson was asked two questions in connection with the hearing on this RVR.

> Q1: Who started the altercation?
> Inmate Winson: I did since I pulled it out of my pocket.
>
> Q2: How did it start?
> Inmate Winson: When I was out to yard, I picked up a black object and put it in my pocket. Once Stockton came out to yard, we were walked together and I pulled the black object out of my pocket and unwrapped it, it was a weapon. We then both got into a struggle over the weapon. I then fell and split my chin open which is where all the blood came from.

Dkt. No. 33 at 18. Plaintiff had asked the hearing office to ask inmate Winson two additional questions: "Who brought the weapon to the yard?" and "Did you suffer any broken bones or lose conscientiousness as a result of the altercation?" Of these two additional questions, the hearing officer did not ask the first question because he deemed it irrelevant due to reports stating that Plaintiff was seen with a black object in his hand and the hearing officer did not ask the second question due to Plaintiff being provided a Form 7219 indicating the injuries suffered by inmate Winson. Dkt. No. 33 at 18. On February 10, 2025, Plaintiff was found guilty of RVR No. 7450428. Dkt. No. 33 at 19.

//

//



United States District Court
Northern District of California

### III. CDCR Administrative Remedy Process and Plaintiff's Relevant Grievances

#### A. CDCR Administrative Grievance Process

During the relevant time period, the California Department of Corrections and Rehabilitation ("CDCR") provided inmates the following administrative remedy process for non-healthcare related issues. To dispute "a policy, decision, action, condition, or omission by the [California Department of Corrections and Rehabilitation] Department or departmental staff that causes some measurable harm to their health, safety, or welfare," the inmate was required to fill out and submit a CDCR Form 602-1 to his prison's Office of Grievances ("OOG") for a first level review. 15 Cal. Code Regs. §§ 3481(a), 3482(a). In the Form 602-1, the inmate was required to "describe all information known and available to the [inmate] regarding the claim, including key dates and times, names and titles of all involved staff members (or a description of those staff members), and names and titles of all witnesses, to the best of the [inmate's] knowledge." 15 Cal. Code Regs. § 3482(c)(2). The inmate was required to submit the claim within sixty calendar days of the claim being discovered. 15 Cal. Code Regs. § 3482(b). The OOG was required to provide the inmate with a written decision no later than sixty calendar days after the OOG's receipt of the grievance, with the decision clearly explaining the reasoning for the decision as to each claim. *Id.* at §§ 3481(a); 3483(i). The inmate could appeal the OOG decision by filing a written appeal with the Office of Appeals ("OOA") within sixty days of discovering the OOG decision. *Id.* at § 3484. A final decision by the OOA was required to exhaust an inmate grievance. *Id.* at § 3483(l).

##### 1. OOG "Rejected" Decision

At the OOG level, the relevant state regulations specified that when a claim concerned an anticipated policy, decision, action, condition, or omission by the department or departmental staff, the OOG should "reject" the claim, 15 Cal. Code Regs. § 3483(g)(6)(B); and that the rejection did not constitute exhaustion of administrative remedies because the prisoner could appeal the decision to the OOA, *id*. at § 3483(l)(1)(F).

##### 2. OOA Decisions – "Denied" or "Rejected"

Among other options, the OOA could "deny" or "reject" the appealed claim. A denial by the OOA ("denied") meant that "the Reviewing Authority found by a preponderance of the

evidence available that the decision by the Office of Grievances was proper." 15 Cal. Code Regs. § 3485(g)(1).

**a. OOA "Denied" Decision – Exhaustion**

The administrative remedies process was exhausted where the OOA "denied" decision" was a decision on the merits or due to a lack of jurisdiction" and the prisoner would not receive any further answer from the OOA. 15 Cal. Code Regs. § 3485(l)(4)(A).

**b. OOA "Denied" Decision – Unexhausted**

The administrative remedies process was not exhausted where the OOA issued a "denied" decision, and the denial was because: (1) the OOG correctly redirected, reassigned, or disallowed the claim, 15 Cal. Code Regs. § 3485(l)(1)(A); or (2) the prisoner failed to write legibly enough for the OOA to understand the issue on appeal as required in subsection 3484(c)(1); 15 Cal. Code Regs. § 3485(l)(2); or (3) the prisoner failed to describe clearly enough why the OOG decision was inadequate as required in subsection 3484(c)(2);15 Cal. Code Regs. § 3485(l)(2); or (4) the OOG correctly screened out the claim as a pending legal matter, 15 Cal. Code Regs. § 3485(l)(4).

**c. OOA "Rejected" Decision - Unexhausted**

A rejection by the OOA ("rejected") meant *inter alia* that "the claim was correctly 'rejected' by the Office of Grievances pursuant to subsections 3483(g)(6)(A) through (g)(6)(D)." 15 Cal. Code Regs. § 3485(g)(6). "If a claim is 'rejected' . . . because the Office of Grievances correctly 'rejected' the claim under subsections 3483(g)(6)(A) through (g)(6)(D), then the administrative remedies process was not exhausted." 15 Cal. Code Regs. § 3485(l)(3).

**B. Grievance No. 573754**

Plaintiff is familiar with CDCR's administrative grievance process, having frequently filed grievances during his time in custody. Dkt. No. 32-2 at 32-39. While in custody, Plaintiff has filed at least fifty grievances regarding poor prison conditions. Dkt. No. 32-2 at 39. Plaintiff testified at his deposition that he had no issues submitting a grievance for the May 31, 2024 incident. Dkt. No. 32-2 at 33, 35.

Plaintiff has identified Grievance No. 573754 as the grievance that he alleges exhausts his claim regarding placing inmate Winson in his RCGP group. Dkt. No. 22 at 5; Dkt. No. 33 at 5.



United States District Court
Northern District of California

Plaintiff submitted Grievance No. 573754 on or about June 5, 2024. Plaintiff titled Grievance No. 573754 "staff misconduct" and alleged in this grievance that Warden Smith endangered him by placing inmate Winson in his group:

> STAFF MISCONDUCT
> Specifically, I was housed in RCGP at PBSP programming successfully without issue or violence. Warden Smith elected to pit prisoner Wi[n]son #C-63916 and I in le[]thal combat, on or about May 24th, 2024.
>
> Prisoner Wi[n]son was classified as a high priority target of a STG prison gang, and documentation generated by staff indicates he was in "bad standing" with an STG prison gang and prisoner Wi[n]son was expected to assault and or attempt to murder any white prisoner approved to group with him, at any time he was approved to group with others.
>
> This documentation was deemed "Reliable" by staff yet Warden Smith elected to put my life in direct jeopardy and approve group with prisoner Wi[n]son and I.
>
> The RCGP program is a hypervigilant violent program and prisoner Wi[n]son has an extensive history of violence. This was known to Warden Smith, CCII Durham and CCII Junno on or about May 24, 2024.
>
> On May 31, 2024 while housed in RCGP I was placed in RHU/ASU for alleged attempted murder of prisoner Wi[n]son.
>
> I was placed in a vulnerable position and Warden Smith is directly responsible. I have a right to life and to be free from dangerous situations. Warden Smith "set up" a violent alter[c]ation with no regard for life.
>
> Action requested:
> Warden Smith be investigated for misconduct, mitigating factors be considered to my placement, and RCGP to closed down and to have CCII Durham and CCII Junno be removed from RCGP classification process, and my rights reserved for civil suit action, with no trickle down c/o harassment.
>
> I do not have access to the documentation located [in] Wi[n]son's C-file in regards to his expectation to assault other white prisoners.

Dkt. No. 33 at 21-22.

On June 13, 2024, the OOG issued a decision rejecting Grievance No. 573754. The OOG decision classified the claim as "Category: Offender Discipline" and "Sub-category: Serious Rules Violations Report." The OOG decision rejected Grievance No. 573754 as follows:

> Your claim concerning Offender Discipline; Serious Rule Violation Report is rejected for the reason or reasons indicated below:
>
> Your claim concerns an anticipated policy, decision, action, condition or omission by the Department or departmental staff. This generally means the decision or action is not final or has not happened yet. Once the decision or action is final or has taken place, you may file a new grievance if you are still dissatisfied.

> If you are dissatisfied with this response you may appeal this decision by mailing the CDCR Form 602-2 included in this response to the California Department of Corrections and Rehabilitation, Office of Appeals. Do not resubmit this claim to the Office of Grievances.

Dkt. No. 33 at 24.

On June 14, 2024, Plaintiff appealed the OOG decision as follows: "My grievance has nothing to do with any serious rule violation report 'findings.' It has to do with Warden Smith, CII Durham & CII Junno putting my life in danger by putting a documented STG gang member/associate enemy in my yard." Dkt. No. 33 at 23.

On July 24, 2024, the OOA issued a decision denying Grievance No. 573754, stating that the OOG correctly rejected Plaintiff's claim as anticipatory and that this decision exhausted Plaintiff's administrative remedies.

> **I. ISSUE ON APPEAL**
> Appellant infers the Department's rejection of this claim as anticipatory was improper.
>
> **II. RULES AND REFERENCES**
>
> **A. CONTROLLING AUTHORITY**
> Title 15, section 3483(g)(6)(B)
>
> **B. DOCUMENTS CONSIDERED**
> CDCR Form 602-1, Log #573754, CDCR Form 602-2, Log # 573754, Grievance Decision, Log #573754
>
> **III. REASONING AND DECISION**
> The institution rejected appellant's claim as anticipatory. A review of appellant's grievance, grievance response, and appeal documents confirms the rejection was proper as the event forming the basis for appellant's claim had not been formally finalized. For this reason, this claim is denied.
>
> **IV. REMEDY**
> Your claim has been denied. Therefore, there is no applicable remedy.
>
> **Decision: Denied**
> After a thorough review of all documents and evidence available at the time of this written decision, it is the order of the Office fo Appeals that this claim is denied. This decision exhausts the administrative remedies available to the claimant with CDCR.

Dkt. No. 33 at 26.

## DISCUSSION

Defendants argue that they are entitled to summary judgment because (1) Plaintiff has not exhausted his administrative remedies; (2) the failure-to-protect claim fails as a matter of law; and



United States District Court
Northern District of California

(3) Defendants are entitled to qualified immunity. Dkt. Nos. 32, 36. Plaintiff has filed an opposition, Dkt. No. 33, and requested leave to file a sur-reply, Dkt. No. 37.

**I. Request for Leave to File Surreply (Dkt. No. 37)**

On June 23, 2026, Plaintiff requested leave to file a surreply. Dkt. No. 37. In his proposed surreply, Plaintiff seeks to file with the Court the Inmate Orientation Book for Pelican Bay State Prison Restricted Custody General Population; argues that his book establishes that prison officials must have inmates sign a CDC 128 stating that they can program with the inmates listed in order to be placed in a small group; argues that Defendants failed to follow this CDC 128 requirement when placing inmate Winson in his RCGP group; and proffers a declaration stating that the RCGP was a stressful, violence-prone environment intended to facilitate gladiator-style fights. Plaintiff argues that Fed. R. Civ. P. 56(d) allows for supplemental filings where the information was unavailable to the non-moving party. *See generally id.*

Plaintiff states that he was unable to include these arguments in his opposition for the following reasons. Plaintiff states that he promptly filed his opposition to the summary judgment motion on December 8, 2025, in order to meet the court deadline, but was aware at that time, and informed the Court accordingly, that he had not been provided the necessary and requested discovery. Dkt. No. 37 at 8. Plaintiff states that he did not receive Defendants' response to his first set of request for production of documents ("RFP") until late December 2025. On January 9, 2026, Plaintiff was moved to California State Prison – Corcoran without access to his property, and he remained housed there until he was transferred back to Pelican Bay State Prison on February 16, 2026, to face charges in Del Norte Superior Court arising out of Defendants' accusation that he had attempted to murder inmate Winson. The Del Norte Superior Court criminal case was dismissed on April 9, 2026, and Plaintiff was sent back to CSP-Corcoran's isolation unit. Plaintiff was informed by CSP-Corcoran staff that most of his property had been stolen, misplaced, or lost. Plaintiff had no tablet and the prison law library had been disassembled to update the technology, which rendered Plaintiff unable to use the computer system to shepardize caselaw. At some unspecified date, Plaintiff was able to locate some of his legal materials, including the response to his RFP and the orientation book. Plaintiff states that he filed

this surreply as soon as he was able. Dkt. No. 37.

Defendants oppose Plaintiff's request to file a surreply for the following reasons. First, Defendants argue that Fed. R. Civ. P. 56(d) is an improper basis for introducing the orientation manual as Rule 56(d) only allows a party to request an order deferring time to respond to the summary judgment motion so that the party may conduct additional discovery; Plaintiff's opposition was not due until December 17, 2025, and he chose to file the opposition early; and Plaintiff should have, and could have, sought an extension of time to file his opposition pending receipt of the answer to his RFP. Defendants also argue that Plaintiff failed to diligently pursue discovery. Dkt. No. 38.

The Court DENIES Plaintiff's request for leave to file the proposed surreply docketed at Dkt. No. 37 because Plaintiff has not met the requirement for filing a surreply. N.D. Cal. L.R. 7-3(d) provides that once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval, except if new evidence has been submitted in the reply or a relevant judicial opinion was published after the date the opposition or reply was filed by filing. N.D. Cal. L.R. 7-3(d). Defendants' reply brief in support of their summary judgment motion did not submit new evidence, *see* Dkt. No. 36; and Plaintiff's surreply did not reference a newly published relevant judicial opinion, *see* Dkt. No. 37. Nor does Fed. R. Civ. P. 56(d) provide a basis for granting leave to file a surreply six months after the opposition was filed. Rule 56(d) provides that if a nonmovant shows by affidavit or declaration that, for specified reasons, he cannot present facts essential to justify his opposition, the Court may defer considering the motion, deny the motion, allow time to obtain affidavits or declarations or to take discovery, or issue any other appropriate order. Assuming arguendo that the proposed surreply presents facts essential to Plaintiff's opposition,[1] the Court finds that Plaintiff has not demonstrated that he could not have timely presented these facts. Plaintiff commenced this action on September 25, 2024, and the Court ordered service of the operative complaint and authorized the commencement of discovery on May 5, 2025. If Defendants' response to Plaintiff's RFP was due in late December 2025,

---

[1] As discussed later in this order, the proposed surreply, including the PBSP RCGP Orientation Manual, does not provide facts essential to Plaintiff's opposition.

presumably Plaintiff served his RFP on Defendants in October or November 2025. Plaintiff has not addressed why he waited six months to serve discovery requests.

**II. Summary Judgment Standard**

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)). The nonmoving party must show more than "the mere existence of a scintilla of evidence." *In re Oracle Corp Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Liberty Lobby*, 477 U.S. at 252). "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Liberty Lobby*, 477 U.S. at 252). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence

submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

**III. Exhaustion Claim**

**A. Exhaustion Requirement and Legal Standard**

The Prison Litigation Reform Act ("PLRA") sets forth the following exhaustion requirement: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is mandatory, *Jones v. Bock*, 549 U.S. 199, 211 (2007), and requires "proper exhaustion" of available administrative remedies, *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion requires using all steps of an administrative process and "demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90–91. Compliance with prison grievance procedures is all that is required by the PLRA to "properly exhaust." *Jones*, 549 U.S. at 217–18.

"Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (alteration in original); *see also Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir. 2005) ("The obligation to exhaust 'available' remedies persists as long as *some* remedy remains 'available.' Once that is no longer the case, then there are no 'remedies . . . available,' and the prisoner need not further pursue the grievance.") (emphasis and alterations in original). "When prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies." *Andres v. Marshall*, 867 F.3d 1076, 1079 (9th Cir. 2017) (per curiam) (administrative remedies unavailable where prison failed to timely respond to inmate's grievance; inmate filed grievance in January 2013 and officials had not responded by December 2014, when inmate filed

federal civil rights claim). To fall within this exception to the PLRA's exhaustion requirement, an inmate must show: "(1) that he actually filed a grievance or grievances that, if pursued through all levels of administrative appeals, would have sufficed to exhaust the claim that he seeks to pursue in federal court, and (2) that prison officials screened his grievance or grievances for reasons inconsistent with or unsupported by applicable regulations." *Sapp v. Kimbrell*, 623 F.3d 813, 823-24 (9th Cir. 2010). A prisoner need not exhaust further levels of review if he has been reliably informed by an administrator that no more remedies are available. *Brown*, 422 F.3d at 935. If prison officials improperly screen out an inmate's appeals, the inmate cannot properly complete the grievance process and administrative remedies are effectively unavailable. *Sapp*, 623 F.3d at 822-23. Administrative remedies are effectively unavailable when prison officials decline to reach merits of a particular grievance "for reasons inconsistent with or unsupported by applicable regulations." *Id.* at 822-24.

Where a prison's grievance procedures do not specify the level of factual specificity required in the grievance, "'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.'" *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)). The grievance should include sufficient information "to allow prison officials to take appropriate responsive measures." *Id.* (citation and internal quotation marks omitted). The grievance need not include legal terminology or legal theories unless they are needed to provide notice of the harm being grieved. *Id.* Nor must a grievance include every fact necessary to prove each element of an eventual legal claim. *Id.* The purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation. *Id.*

Failure to exhaust under the PLRA is an affirmative defense that the defendant must plead and prove. *Jones*, 549 U.S. at 204, 216. The defendant's burden is to prove that there was an available administrative remedy and that the prisoner did not exhaust that remedy. *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014). Once the defendant has carried that burden, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively

United States District Court
Northern District of California

unavailable to him. *Albino*, 747 F.3d at 1172. But as required by *Jones*, the ultimate burden of proof remains with the defendant. *Id.* If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. *Id.* at 1166. But if material facts are disputed, summary judgment should be denied and the district judge rather than a jury should determine the facts in a preliminary proceeding. *Id.*

**B. Analysis**

Defendants argue that Grievance No. 573754 did not exhaust the claim in this action – Defendants' alleged failure to protect him from the May 31, 2024 assault by inmate Winson – because the grievance was not substantively decided as it was procedurally rejected as anticipatory pursuant to 15 Cal. Code Regs. § 3483(g)(6)(B). Specifically, Defendants argue as follows. The OOG correctly rejected Grievance No. 573754 on June 13, 2024, because the June 9, 2024 RVR accused Plaintiff of attacking and attempting to murder inmate Winson on May 31, 2024, and the issue of whether inmate Winson was wrongfully assigned to Plaintiff's Group 6 therefore could not be decided until the RVR was decided, which did not happen until February 10, 2025. The OOG's rejection was procedural and not on the merits. The OOA denial was also not a substantive review of the underlying merits of Grievance No. 573754, and was simply a concurrence with the OOG decision to procedurally reject the grievance as anticipatory. In support of these arguments, Defendants cite the language in the OOG decision instructing Plaintiff to wait until the decision or action being grieved was final and file a new grievance at that time, and also cite 15 Cal. Code Regs. § 3485(l). Defendants argue that Plaintiff was required to file a new grievance after the RVR was decided in order to exhaust the claim in this action. *See generally* Dkt. No. 32 at 13-16; Dkt. No. 36.

Plaintiff argues that Grievance No. 573754 satisfied the PLRA's exhaustion requirement for the following reasons. First, Plaintiff argues that Grievance No. 573754 was misconstrued as challenging RVR No. 7450428, when in actuality it "clearly" challenged staff misconduct, namely correctional officials' decision to place inmate Winson in Plaintiff's group despite knowing that inmate Winson would assault or murder any white inmate with whom he was grouped. Dkt. No. 33 at 4. Second, Plaintiff argues that Grievance No. 573754 gave notice to correctional staff that

he sought to grieve the claim raised in this action, therefore satisfying the purpose of the PLRA's exhaustion requirement, and that proper exhaustion does not require that he pursue "other grievance paths that are irrelevant to the issue at hand," such as the validity of the RVR since the validity of the RVR is not determinative as to whether the decision to place inmate Winson in Plaintiff's group was appropriate. Dkt. No. 33 at 5. Third, Plaintiff argues that prison officials rendered administrative remedies unavailable when they failed to follow protocol for investigating staff misconduct claims by refusing to substantively address the issues raised in Grievance No. 573754 and instead giving a blanket rejection. Dkt. No. 33 at 6.

The Court finds that Defendants have not carried their burden of proving that Plaintiff did not exhaust his available administrative remedies.

First, the OOA decision is reasonably read as exhausting Plaintiff's administrative remedies. Although the OOA decision agreed that the OOG correctly denied the grievance as anticipatory, the language in the OOA decision otherwise implied that administrative remedies were exhausted. The OOA decision specified that the OOA "denied" Grievance No. 573754; stated that the "decision exhaust[ed] the administrative remedies available to [Plaintiff] within the CDCR," and that Plaintiff had "no applicable remedy." Dkt. No. 33 at 26. 15 Cal. Code Regs. § 3485(1) specifies that a "denied" decision exhausts a prisoner's administrative remedies where the denial is "on the merits or due to a lack of jurisdiction," *id*. § 3485(1)(4)(A), and that the only instance where a denial does not exhaust administrative remedies is where the denial is based on the determination that the OOG correctly redirected, reassigned, or disallowed the claim, *id*. at § 3485(1)(1)(A). As the OOG did not redirect, reassign, or disallow Grievance No. 573754,[2] and the OOA stated that Plaintiff's administrative remedies were exhausted, Plaintiff could reasonably believe that in using the phrase "denied," the OOA had decided Grievance No. 573754 on the

[2] 15 Cal. Code Regs. § 3483(g) defines "redirected" as forwarding the grievance to an appropriate authority such as the healthcare division, or the Remedies Compliance Coordinator, or the Public Records Act Coordinator; defines "reassigned" as assigning the claim to a different Office of Grievances than the one which originally received it because the majority of evidence is located at the other Office of Grievances; and defines "disallowed" as discarding the grievance because it was contaminated with organic, toxic, or hazardous materials that may threaten staff safety or institutional security. 15 Cal. Code Regs. § 3483(g)(4), (5), (7).

merits, and that the denial therefore exhausted his administrative remedies pursuant to 15 Cal. Code Regs. § 3485(1)(5)(A). In contrast, if the OOA had "rejected" Grievance No. 573754, as the OOG had done, Plaintiff's administrative remedies would have been unexhausted pursuant to 15 Cal. Code Regs. § 3485(1)(3). The OOA's decision to "deny," instead of "reject," Grievance No. 573754 exhausted Plaintiff's administrative remedies.

Second, Plaintiff was not required to file a new grievance after his RVR was decided as the OOA decision reliably informed him that no more remedies were available by stating that the "decision exhaust[ed] the administrative remedies available to [Plaintiff] within the CDCR," and that Plaintiff had "no applicable remedy." *See Brown*, 422 F.3d at 935 (prisoner need not exhaust further levels of review if he is reliably informed that no more remedies are available).

The Court therefore DENIES Defendants' motion for summary judgment based on the failure to exhaust administrative remedies.

## IV. Eighth Amendment Claim

### A. Legal Standard

The Eighth Amendment requires that prison officials take reasonable measures to guarantee the safety of prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The failure of prison officials to protect inmates from dangerous conditions at the prison violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is, subjectively, deliberately indifferent to inmate health or safety. *Farmer*, 511 U.S. at 834. A prison official is deliberately indifferent if he knows of and disregards an excessive risk to inmate health or safety by failing to take reasonable steps to abate it. *Id*. at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference. *See id.* at 837. With respect to the subjective prong of an Eighth Amendment violation, "deliberate indifference entails something more than mere negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests

United States District Court
Northern District of California

or safety." *Whitley*, 475 U.S. at 319. Neither negligence nor gross negligence will constitute deliberate indifference. *See id*. at 835-36 & n.4. A prisoner need not wait until he is actually assaulted or harmed to state a claim and obtain relief. *See Farmer*, 511 U.S. at 845.

**B. Analysis**

Defendants argue that Plaintiff's Eighth Amendment claim fails as a matter of law because Plaintiff has not presented evidence that Defendants knew of, and failed to address, a significant and plain risk to his safety from placing inmate Winson in his group. Defendants point to the following in support of their argument. Defendants conducted a comprehensive review of inmate Winson's records in preparing for the May 23, 2024 ICC hearing, and the review did not indicate that inmate Winson posed a significant safety risk to Plaintiff or that inmate Winson would target and attack another white inmate in his RCGP group. While inmate Winson had past disciplinary issues, many inmates assigned to the RCGP unit similarly had past disciplinary issues, including violence-related infractions, and inmate Winson's last incident of violence was over a year prior. Inmate Winson had no documented enemy concerns with any of the Group 6 inmates. Inmate Winson and Plaintiff were not affiliated with enemy Security Threat Groups ("STGs"); rather, inmate Winson and Plaintiff were documented as affiliated with the same STG. There was also no indication during the May 23, 2024 ICC hearing that inmate Winson had any issues with, or would attack, Plaintiff. In his deposition, Plaintiff stated that, prior to the May 31 incident, he got along "fairly well" with inmate Winson. Plaintiff never expressed any safety concerns about inmate Winson or to any correctional staff prior to the May 31, 2024 incident. Dkt. No. 32 at 18-21.

Plaintiff opposes the summary judgment motion on the following grounds. Plaintiff argues that it was clear to Defendants that inmate Winson would attack him because of the following factors. Inmate Winson had a "lengthy assaultive history." He had three incidents in RCGP prior to May 2024; two of the three incidents involved assaulting other inmates; and the other inmates attacked were all alleged STG affiliates. Defendants know that STG white affiliates have been instructed to assault other white inmates with the intent to murder, or else be murdered themselves. Plaintiff has a documented history of enemy concerns with all STG affiliates. In addition, the fact that Plaintiff previously programmed peacefully for 30 days in the RCGP

without another white prisoner put him at risk from all STG affiliates. Plaintiff further argues that Defendants demonstrated deliberate indifference to his safety by failing to alert him that inmate Winson would be housed with him; by not interviewing Plaintiff prior to placing inmate Winson in Group 6; and by not giving Plaintiff an opportunity to oppose inmate Winson's placement in Group 6. Dkt. No. 33 at 7-9.

In their reply, Defendants argue that Plaintiff's arguments are without merit for the following reasons. There is no regulation or policy requiring Defendants to conduct an ICC hearing with the inmates already assigned to a group prior to assigning a new prisoner to that group. Plaintiff had the opportunity to oppose inmate Winson's placement because he was free to inform staff at any time of any safety concerns he had regarding inmate Winson. Inmate Winson's documented STG affiliation did not preclude his assignment to Group 6 or to a group with Plaintiff because Plaintiff and Winson are not documented as enemies; Plaintiff and Winson are affiliated with the same STG; inmate Winson had previously programmed in a group setting in RCGP without incident; inmate Winson had remained discipline-free for the prior year; inmate Winson had no documented enemy concerns with any Group 6 inmate; and inmate Winson had expressed a desire to program positively in a group setting and stated that he could safety program with inmates in Group 6. Dkt. No. 36 at 4-6.

Viewing the record in the light most favorable to Plaintiff, the Court finds that Plaintiff has not demonstrated a triable issue of material fact as to whether Defendants violated the Eighth Amendment. The Eighth Amendment has a two-part test. First, did the prison official know that prison conditions posed a substantial risk of serious harm to the inmate? If the prison official knew, then the second question is did the prison officials take reasonable steps to abate the harm? Here, Plaintiff has not demonstrated a triable issue of fact as to whether Defendants knew that Plaintiff faced a substantial risk of serious harm if inmate Winson were placed in Plaintiff's RCGP group. It is undisputed that Plaintiff never informed Defendants of any safety concerns that he had regarding inmate Winson. Defendants have stated that they drew the conclusion that the Group 6 inmates, including Plaintiff, were not at risk of substantial harm from inmate Winson's placement in Group 6, and that they reached this conclusion after they reviewed inmate Winson's case factors

and disciplinary history and took into consideration the enemy concerns of Plaintiff and the other Group 6 inmates.

Plaintiff has not pointed to any facts supporting a reasonable inference that Defendants ever subjectively concluded that a serious risk of harm existed here. Instead, the uncontroverted record contains a number of facts supporting Defendants' conclusion that it was safe to place inmate Winson in Plaintiff's group: (1) placing an inmate with past disciplinary issues in a group did not expose the other inmates to a substantial risk of serious harm as many RCGP inmates had a history of disciplinary issues yet programmed successfully in group; (2) inmate Winson had been disciplinary/violence free for a year prior to placement in Group 6; (3) inmate Winson expressed a desire to program successfully in group; and asked to be placed in Group 6; (4) inmate Winson was not a documented enemy of anyone in Group 6; and (5) inmate Winson and Plaintiff were affiliated with the same STG. Plaintiff's argument that Defendants should have known that Plaintiff was at risk if housed with inmate Winson does not state an Eighth Amendment claim, as the Eighth Amendment requires that Defendants knew of the risk, not should have known of it. *Farmer*, 511 U.S. at 837 (official must both be aware of facts from which inference could be drawn that substantial risk of serious harm exists, and must also draw that inference). The issue is not whether Defendants' judgment ultimately turned out to be correct, or was perfect. Instead, the Eighth Amendment requires a showing on which a reasonable jury could conclude that Defendants were deliberately indifferent in the face of an objectively and subjectively determined serious risk. The record here establishes no material dispute of fact on these issues.

Similarly, Plaintiff's argument that Defendants exposed him to harm by failing to consult him before placing inmate Winson in his group fails to state an Eighth Amendment violation as a matter of law. There is no prison regulation requiring prison officials to obtain consent or feedback from the inmates already in the group before assigning a new inmate to that group.[3]

---

[3] The PBSP RCGP Inmate Orientation Handbook does not require prison officials to obtain CDC 128 from inmates already in the group before a new inmate is assigned to the group. Rather, the handbook's CDC 128 directive applies to inmates wishing to be in the group. Dkt. No. 37 at 17 ("Inmates wishing to be in a group should sign a CDC 128 stating that they can program with the inmates listed on the CDC 128.")

More importantly, the Eighth Amendment does not require this either.

The Court therefore finds that Defendants are entitled to summary judgment as a matter of law on Plaintiff's Eighth Amendment claim.

**V. Qualified Immunity**

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Because there was no violation of Plaintiff's constitutional rights, as explained above, the inquiry ends.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Plaintiff's request for leave to file a surreply, Dkt. No. 37; and GRANTS Defendants' motion for summary judgment. Dkt. No. 32. Judgment is entered in favor of Defendants and against Plaintiff. The Clerk shall close the case.

This order terminates Dkt. No. 32.

**IT IS SO ORDERED.**

Dated: 9/9/2026

Haywood S. Gilliam, Jr.

HAYWOOD S. GILLIAM, JR.
United States District Judge